IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

FILED
NOV -2 2020
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

MIGUEL A. PONCE,

    Plaintiff,

v.

CHEVRON CORPORATION,

    Defendant.
_____/

CASE NO.:
CV20   7813

JSC

## COMPLAINT

Plaintiff, Miguel A. Ponce, hereby sues Defendant, Chevron Corporation, and alleges as follows:



1. This is an action for damages which exceed $75,000, and specifically for $750,000, exclusive of court costs and attorney's fees when Plaintiff secures counsel.

2. This is an action for compensatory and punitive damages due to discrimination in employment based upon National Origin, and is brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3, *et al*; the Civil Rights Act of 1991, 42 U.S.C. § 1981a, *et seq.*; and 42 U.S.C. § 1983.

3. At all times relevant, Defendant was a corporation formed and registered under the laws of Delaware but which maintained its its headquarters and principal place of business in Contra Costa County, California,

and is therefor subject to suit in this Court. See e.g., *BNSF Railway v. Tyrrell*, 581 U.S. ____ (2017).

4. At all times relevant, Plaintiff was a citizen of Mississippi, and Defendant operated a division where it performed business operations at Defendant's aircraft operations division in Picayune Mississippi, and where Plaintiff was employed by Defendant as an Aircraft Mechanic.

5. Plaintiff was hired by Defendant into the position of Aircraft Mechanic at Defendant's Picayune, MS, location on or about March 26, 2012.

6. Plaintiff is of Mexican national origin. He speaks fluent English and Spanish; however, owing to the fact that he was born and raised in Mexico, Plaintiff has a pronounced and substantial Spanish accent.

7. At all times relevant during his employ with Defendant, Plaintiff's co-workers and supervisors all were not Mexican and no one had any type of Spanish or Mexican accent, or any foreign accent whatsoever.

8. Immediately upon his employ in 2012, Plaintiff incurred difficulties with a co-employee mechanic, Matt Shute, related to Plaintiff's national origin. It was apparent that Shute did not like neither Plaintiff nor Mexicans generally, and he immediately began making

comments, jokes and criticisms of Plaintiff's accent.

9. Because of that harassment and discrimination against him, Plaintiff filed a complaint against Shute with Defendant. Defendant investigated the complaint and took some action against Shute as a result, as was proper.

10. However, Shute always resented what Plaintiff had done in complaining about him and told Plaintiff that he would not forget it. Shute then began a campaign, spanning years, where he would tell other employees and supervisors how Plaintiff had complained against him; frame Plaintiff's actions as unjust; and tell people that they "needed to watch out" for Plaintiff.

11. As the years passed, Shute's dislike and criticism of Plaintiff only increased and it infected other employees and even supervisory staff. He continued his campaign of denigrating comments and references of Plaintiff expressed to other employees and supervisors alike.

12. Starting with the actions of Shute and then spreading by infection to other employees, from the time of his hire and continuing until the termination of his employment, Plaintiff routinely suffered discrimination and mistreatment at work from Shute, other employees an

      even supervisors in the way of things like:

- Plaintiff being ignored when he spoke, purposely ignoring his words in their Mexican accent, as if he did not exist, even when he was working on jobs that required him to work with someone else.
- Plaintiff being de facto excluded from opportunities to work on aircraft or in functions that would increase his skill or reflected his experience because people did not want to interact with him due to his accent and heritage.
- Plaintiff being looked at and interacted with in a manner that objectively reflected animus toward him and as if he was inferior.

13. Such manner of discrimination toward Plaintiff continued year after year and as time passed only became worse.  Ultimately, even Plaintiff's Maintenance Superintendent, Paul Mouton, began to treat Plaintiff the same way as other employees, ignoring him, acting with general contempt for him for no reason, etc.
14. Over the years, Plaintiff made complaints to his supervisors and to Defendant's Human Resources Department many times.
15. In and about August and September 2019, Plaintiff complained to Human Resources that the actions of Shute

and Mouton were unfair and unjust and that they continued to campaign against him suggesting to employees and supervisors alike that he was someone to "watch out for," and that he was otherwise generally disliked, mistreated, ignored and marginalized by Shute and Mouton (as managerial representative of Defendant) at work.

16. Owing to Plaintiff's less-than-perfect command of the English language sometimes Plaintiff said and says things that are objectively neutral, but can be misinterpreted by an unreasonable person who wishes harm against him and intentionally misconstrues his words for nefarious purposes.

17. During the investigation of Plaintiff's complaints in August and September 2019, Plaintiff, made a comment, in Defending himself and in explaining the situation, that if Shute had said things about him that were wrong that things "were not going to be good for him [Shute]."

18. Such comment by Plaintiff was not a threat. It was just a comment of his understanding of the facts and reciting of same, and based on his true belief that Defendant's Human Resources Department would conduct a fair and propr investigation and that if it did the

right thing, it would take action that would be fair toward Plaintiff and "not good" for Shute.

19. At the time he made this comment, no one – not any employee, not Human Resources and not anyone at Defendant's offices, advised Plaintiff that they considered the comment a threat, nor that they intended to treat it as threat. In fact, at the time of the making of the comment, no one at Defendant in any capacity said anything about the comment whatsoever.

20. This comment, on its face, is objectively not threatening of any improper conduct, such as physical violence, and in the context of its making, and considering the limitations of Plaintiff's use of English, it would be wholly unreasonable and indeed discriminatory to interpret the comment as threat of violence.

21. On or about October 1, 2019, Plaintiff left work and discovered that there was a large bolt embedded in the side wall of his front tire. The bolt was very large and owing to the place it was embedded, it was clear that such had to have been put there intentionally by someone at work.

22. Plaintiff immediately suspected Shute and expected that the bolt was the doing of him and/or others working for

and at Defendant done to harass and intimidate him. The tire was hopelessly damaged and required replacement.

23. Plaintiff then asked Defendant to provide him with camera video recorded footage from the employee parking lot that would show him who had caused the damage to his tire. At that time he was told that his request would be reviewed.

24. However, the next day, on October 2, 2019, Plaintiff was advised that he had to leave work immediately because he was too "stressed" and he was told to go home and remain suspended with pay pending the result of an investigation into who and how it came to be that his tire was damaged. Plaintiff was not stressed and had been that day, and fully was in the future, capable of safely and satisfactorily working. However, he had no option but to do as instructed.

25. A few days later, Plaintiff discovered yet another bolt lodged the same way in the sidewall of his other front tire. The bolt was certainly inserted at the same time as the first (since he was not at work anymore immediately after complaining of the first), but owing to a nuance in its placement it allowed air to leak out slowly so that it was not immediately discovered.

26. Upon discovery of the second bolt in the second tire Plaintiff contacted Defendant's Human Resources Department and again asked to see the camera footage. His request was never honored.

27. During the reports to Human Resources of the tire damage that had been inflicted upon him, Plaintiff made the comment that if he discovered who had done the tire damage to his vehicle that he "was not gonna have mercy."

28. This comment by Plaintiff, made in the context of the limitations of his English and English subtext, was meant to convey that if he discovered who at the company damaged his tires he had no intent to keep it simply a "Chevron" matter in-house, but that he intended to file a report with the police and otherwise seek legal remedies for his damages; he was not going to simply accept an apology or some discipline for the employee.

29. This comment, on its face, is objectively not threatening of any improper conduct, such as physical violence, and in the context of its making, and considering the limitations of Plaintiff's use of English, and his past years of employment and the many interactions of Defendant's employees with him so as to

understand his manner of speaking, it would be wholly unreasonable to interpret the comment as a threat of violence.

30. Indeed, in the entire seven years he was employed, despite the continuing discrimination against him, Plaintiff never engaged in any acts of physical violence.

31. More than two months passed and Defendant had still yet to complete what should have been a simple investigation, taking maybe a day or two, into how Plaintiff's tires came to be damaged and who did it, as the complaint lodged by Plaintiff was about the tire damage cause and nothing more.

32. Then, on December 16, 2019, Defendant was contacted by Human resources who advised him that as a result of the investigation into the tire damage -an investigation he requested based upon an offensive incident against him that he voluntarily reported - HIS employment was being terminated effective immediately because the investigation by the company revealed that he was "threatening" employees.

33. Specifically, Defendant alleged to Plaintiff that the two comments made by Plaintiff during the investigations at issue; the one that if Shute was

acting appropriately things "were not going to be good for him," and the one that if he found out who damaged his tires he "was not gonna have mercy," were threats of physical violence warranting the termination of his employment.

34. Defendant's assertion that the comment of Plaintiff that things "were not going to be good for him" is patently absurd considering that the comment was made long before even the incident involving Plaintiff's tires and his complaint regarding the tires, and at and after the time he made it months earlier Defendant took no action whatsoever, and Plaintiff was then working with no restrictions. Rather, Defendant intentionally reached back in time to find a non-existent fabricated impropriety of Plaintiff, and then perverted it to be an improper current threat solely and wholly to form a pretext to discriminate against him due to his national origin.

35. All told the stated reason for the termination of Plaintiff's employment is wholly pretextual, and the real reason that Plaintiff's employ was terminated was solely and wholly because the company did not want him around anymore because he was Mexican and specifically because of his Mexican accent which was out of place in

the "all-English" workplace, and his presence was causing friction internally because other employees, and even supervisors, did not want to work with Plaintiff because he was Mexican, and resented him and did not wish to communicate with him because of his substantial Mexican accent.

36. The termination of Plaintiff's employment, therefore, being founded and based upon Plaintiff's national origin, violated Title VII of the Civil Rights Act of 1964, as amended, and the laws cited herein.

37. On or about May 18, 2020, Plaintiff timely filed a Charge of Discrimination against Defendant with the United States Equal Employment Opportunity Commission (EEOC), Charge Number 425-2020-00355, wherein Plaintiff charged Defendant with National Origin discrimination in its termination of his employment and in its employment practices in contravention of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e.

38. Plaintiff's Charge was dismissed on August 4, 2020 because the EEOC could not substantiate that Defendant was not in compliance with the law, and on that date Plaintiff was mailed a "Dismissal and Notice of Rights" letter which afforded him ninety days to file suit against Defendant under the laws cited herein for

discrimination in employment.

39. This action against Defendant is timely commenced because it is filed within 90 days of Plaintiff's receipt of his "Dismissal and Notice of Rights" letter.

40. As a result of Defendant's illegal discrimination against Plaintiff and the termination of Plaintiff's employment, Plaintiff has suffered damages, and will suffer damages in the future, consisting of loss of back pay, interest on back pay, loss of front pay, loss of anticipated salary due to salary increases, loss of benefits of employment, loss of opportunity, emotional pain, suffering and inconvenience, and mental anguish.

41. Defendant should be punished for its conduct respecting Plaintiff because Defendant was well-aware that its conduct violated anti-discrimination laws; the discrimination was sanctioned and performed by persons with managerial authority; Defendant failed to implement its own stated policy of anti-discrimination in employment; and Defendant failed to act in good-faith in enforcing its anti-discrimination polices and rather affirmatively acted in bad faith by firing Defendant for fake and non-existent "threat" allegations, when Defendant knew such were not threats, and did so only as result of Plaintiff's own complaints

of harassment and discrimination after a long history of being discriminated against due to his national origin and accent, and Plaintiff should recover from Defendant a proper sum for punitive damages.

42. Plaintiff will retain an attorney to represent him in prosecuting this action and will be obligated to pay them a reasonable fee for their services.

43. Plaintiff is entitled to recover from Defendant his reasonable attorney's fees incurred in prosecuting this action pursuant to the laws cited in paragraph 2, *supra*.

WHEREFORE, Plaintiff demands judgment against Defendant for the compensatory damages as alleged supra, plus punitive damages, plus court costs, reasonable attorney's fees, and other legal and equitable relief the Court deems just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

*[signature]*

**MIGUEL A. PONCE**
Plaintiff, *Pro se*
2838 N. Stewart Street
Kissimmee, Florida 34746
(832)527-1803
Mapf1969@outlook.com - email